Good morning, Your Honors. Barbara Rizzo, Plaintiff Appellant, Linda Barron. May it please the Court. In this case, the Social Security Administration made numerous errors of law, and the Social Security Administration's decision denying Ms. Barron disability benefits substantial evidence to support it, and therefore should be overturned. One of the most significant issues in this case is the SSA's failure to meet its burden of proving that Ms. Barron can perform other work in the national economy. Specifically, the SSA failed to apply the proper rules under the Medical Vocational Guidelines, better known as the GRID rules. Also, the work identified by the Social Security Administration was either light in exertional level, it was unskilled, and or it required repetitive use of the hands and good visual acuity, qualities that Ms. Barron lacks. The vocational expert failed to explain why his testimony conflicted with the information in the Dictionary of Occupational Titles, and the SSA failed to inquire about the conflict, and the ALJ failed to explain in his decision how the conflict was resolved. The hypothetical questions upon which the SSA relied did not include all of Ms. Barron's limitations, and therefore have no evidentiary value. She, for some of the complaints that she voiced, there was, she had never received any medical attention or even made any complaints concerning some of the things which she attributed to her inability to work. Can you be more specific, Kevin? The mental, psychological, she never saw a psychiatrist or a psychologist for any of her mental disabilities. The pain that she complained of was something which, for which she did not have any treatment to the extent that she complained of her inability to work and receive pain when she worked. I think she did receive treatment for her complaints, Justice Cowan. She received treatment for her diabetes, and a lot of the pain in her hands and her lower extremities was due to diabetic neuropathy, peripheral neuropathy from the diabetes. She also did receive treatment for her mental disability. She received treatment from a, not from a psychiatrist. She received, she got Prozac from her doctor, but she didn't receive any psychological care from anyone. It's true. She did receive Prozac from her general doctor at Kaiser. However, there's been a case law that's in this circuit that says that one who's complaining of a mental impairment can't really be blamed for not seeking treatment for that impairment due to the nature that it is a mental impairment. Is that always the case? I believe it is, yes. You mean it's a rule if you, it's sort of like catch-22, reverse catch-22? You always have a mental impairment because you didn't go seek treatment? Well, I don't think someone can be blamed. It covers a lot of territory. Well, I think someone can't be blamed for not seeking treatment when it isn't a mental impairment. Well, it doesn't depend on what kind of mental impairment it is. If you're, let's say, depressed all the time and, I mean, it's one thing if you're delusional, if you think you are talking to a plumber and you're talking to a doctor. If you're that delusional, it's one thing, but there are many kinds of mental impairments for which people, the mental impairment itself does not interfere with the ability to obtain treatment. That could be true for some mental impairments, but I think depression is probably one of the impairments that are, would fall into the category where... Why isn't this the kind of thing that the tire of fact can resolve and that the tire of fact needs to resolve? I'm sorry, could you please... Why isn't this the kind of issue that the tire of fact needs to resolve? I don't have any way of knowing what kind of mental impairment would prevent you from seeking treatment. We know for a fact that lots of people go see psychologists and psychiatrists and do get treatment for mental impairments, so it can't be the case that everybody who's got a mental impairment is too impaired to get treatment. It seems to me this is a factual issue that has to be decided in each case. That would probably be true if ALJs were doctors and could make that determination, but they're not doctors and can't make that determination. Well, then they're not doctors either about making other kinds of determinations. That's why they have doctors who testify. That's why they have evidence. I mean, if you think that an ALJ has to be a contractor or a judge has to be a contractor to consider a case involving construction defects, you know, the whole idea is you have a judge who's not an expert and then relies on testimony of experts to make a decision, huh? Yes, but there was no expert that testified in this case that stated that Ms. Barron should have sought treatment and she should be blamed for not seeking it. Well, wasn't it her word to say, look, she couldn't be expected to seek treatment because the kind of impairment she had prevented her from realizing she needed treatment? I think that's... Was there any evidence like that? No, there was not. I think to make that determination, there needed to be an expert witness. She actually did seek and receive mental health treatment, didn't she? Yes, she did, from her doctors at Kaiser. Yeah, I'm looking at 193 of the ER and it says, shows a record for consulting a doctor, refers to Dr. Paula Tucker, and then at the bottom it says P. Tucker, Ph.D. I assume that means Dr. Tucker is a psychologist. I believe you're right, Justice. I mean, if it said MD, Ph.D., I guess it would be a psychiatrist, but it says Ph.D. and it indicates that she sought treatment for, among other things, depression. Am I right? I believe you're correct, yes. What troubles me is that she never received any treatment at the level of the severity that she claimed her symptomatology existed. In other words, look, everyone here, even your adversary will acknowledge that she can do only, she's never going to be a football player. They're only saying she can do sedentary work, but there's nothing in this record that indicates that she ever sought treatment at the level of the severity that she claimed her illness dictated. And I think that's in large measure, as a matter of fact, that's what the ALJ to some extent has had on. He claims that she can do sedentary work. He knows that she can't do constant work with her hands and so forth, but that doesn't mean that she can't occasionally use her hands. It's just that she can't do something repetitively with her hands. That's correct, but the jobs identified by the Social Security Administration, all of them or most of them require repetitive use of the hands, or at least occasional use of the hands. Well, occasionally she can use her hands, she just can't do it, use her hands repetitively. Well, occasionally is a term that's defined by the regulations, and according to the regulations, occasionally means one-third of the time. So in an eight-hour day, she would be using her hands at least up to three hours, I would think, in an eight-hour day, or close to three hours in an eight-hour day. That I think would also qualify as repetitive. However, the job that required only occasional use of the hands had other problems that showed that Ms. Barron could not perform that job. Specifically, the job that required repetitive use of the hands only on an occasional level was an unskilled position. That was a surveillance system monitor position. According to the regulations, Ms. Barron, in order to be found not disabled, she would have to be able to perform jobs that were skilled. Skills do not transfer to unskilled positions. Therefore, the surveillance system monitor position that required only occasional use of the hands was an unskilled position. So that position does not satisfy the commissioner's burden of proving that she is not disabled, based on that position. You have about a minute left. Do you want to save it? I'm sorry, could you please repeat that? You have about a minute left. Do you want to save it? Yes, thank you. Good morning. My name is Leo Moxnegro, appearing for the Appellee Commissioner of Social Security. Your Honors, the issue in this case, this review of the commissioner's final decision, is whether the final decision is supported by substantial evidence and free of reversible legal error. The claimant has raised several issues concerning her mental limitations, and as this Court has alluded to. Let's talk about that for a minute. The ALJ said at ER 55, do you have that with you? Yes, Your Honor. That she never sought mental health treatment. That's just flat wrong, isn't it? I don't know that the claimant ever sought mental health treatment. Can you start with a yes or no? Pardon? Can you start with a yes or no? Is that flat wrong? That statement by the ALJ is wrong, isn't it? No, that's not wrong, Your Honor. I think the piece of evidence that the Court cited to earlier at Excerpts 193, I think it was, shows that the claimant was referred to for mental health treatment. Whether she sought it herself, I don't know. I don't know that that's exactly correct. On what basis do you tell this panel that she was referred to Dr. Tucker? Because it was the form cited at Excerpts 193 as a request for consultation and reply. So she belongs to the health plan at Kaiser Permanente. Yes, Your Honor. And she goes in and somehow they find out, they don't ask her, would you like some treatment for depression, do they? I don't know. I don't think so. I don't think that's the case here. She indicated to, let's assume she indicated to another medical specialist that among her problems were depression and that that doctor then sent her to Dr. Tucker. Would you say in that circumstance that she didn't seek treatment? Oh, in that circumstance, yes, if she was. And if you go to your family doctor and you complain about A, B, and C, and C requires a specialist, and your family doctor sends you to a specialist, you've sought that treatment, haven't you? Yes, Your Honor. You would concede that, wouldn't you? Oh, yes. Then the ALJ is wrong about that, isn't he? To the extent that you look at it that way, she didn't seek any further treatment than that from a specialist. I think the more important thing to go to. What was she supposed to do? What was she supposed to do, Your Honor? If her impairments, if her mental impairments were as disabling as she claimed, one would think that she would have received more treatment since she apparently received some treatment through Kaiser. They gave her Prozac and that's it. Is there any evidence in the record by any medical expert to suggest that she should have sought further treatment, other than the ALJ statements? Examining psychologist Dr. Cohen commented on claimant's lack of mental health treatment, and I think she just said that just in that way without referring. That could be a comment on what was available to her, not what she sought. Let's move on to her physical impairments. What's the rule in the Ninth Circuit if there's medical evidence to support the existence of an impairment about the ALJ speculating as to its severity? Can you tell us what that rule is? Speculating as to its severity. I think, Your Honor, the extent to which an impairment results in limitations depends on the physician's opinions. In ALJ's assessment of severity, or I guess in this case the mental impairments. Let me see if I can state it for you. Isn't it the rule in the Ninth Circuit that if there is medical evidence to support the existence of a physical impairment, that the ALJ cannot speculate about its severity without additional evidence? Isn't that the rule? Yes, Your Honor. Okay. Wasn't there evidence, substantial evidence, that there are carpal tunnel syndrome, diabetes, other physical impairments? And this is not a case where the ALJ said, I don't believe this woman at all. He said, I just don't believe your pain is severe as you say it is, right? Yes, Your Honor. What was his basis for doing that? Well, that was based on the medical opinions about what claiming could and couldn't do as to her physical functional limitations. The ALJ wholly accepted as to limitations related to carpal tunnel syndrome or diabetic neuropathy, whatever you want to attribute to her hand and arm problems. The ALJ wholly relied on examining physician Dr. Post's opinion. And as a matter of fact, I think it's in the questioning of the vocational expert, the discussion concedes that those limitations came directly from Dr. Post about being precluded from repetitive wrist movement, repetitive gripping, grasping, prolonged keyboarding activities. That came straight out of the medical evidence, Your Honor. There might have been medical evidence to the contrary, but that's a matter of conflicting evidence for the ALJ to resolve. Her daughter testified, didn't she? Yes, Your Honor. About her pain and limitations. Yes. And the ALJ disregarded that testimony, didn't he? The ALJ addressed it and stated his reason for. You don't have to argue with it. He disregarded it. He said, I don't believe it, right? Oh, yes. I thought you meant he overlooked it. No, he said, I just don't believe it. Yes, Your Honor. On what basis? He said because it was inconsistent with the medical evidence. I believe he was referring to the opinions in the record about what claimant could and couldn't do. If he was wrong to disregard the claimant's testimony, would he be equally wrong to disregard the daughter's testimony about the severity of pain? Well, to the extent that their testimony was trying to approach the same conclusion that the claimant was disabled, no, it wouldn't be wrong. It wouldn't be wrong for the ALJ to reject both the claimant and daughter's  testimony. So if an ALJ improperly rejects the testimony of a claimant for reason A and a family member gets up and testifies as to the same subject, limitations, physical pain, severity of pain, the ALJ is perfectly free to disregard that testimony for no reason other than the fact that he disregarded the claimant's testimony. Is that what you're telling us? Oh, no, Your Honor. Not at all. No. In this case, the ALJ's reason was that the ALJ's reason for discounting claimant's daughter's testimony was that to the extent that the daughter's testimony was trying to establish disability, that was inconsistent with the medical evidence, not inconsistency with the claimant's testimony, but inconsistency with the physician's opinions. And that was the reason given by the ALJ, and that was the reason that was affirmed by district court. That would be, I believe, a page of, well, that would be in the ALJ's decision. At page, this is the excerpts of record, page 55. Can you point to the line? In discussing the, well, in the previous page, 54, at the bottom of that page, the ALJ is discussing claimant's daughter's testimony and recounts that, and then at the top of page 55, the ALJ concludes the medical evidence establishes no medical basis for such restrictions, and in the absence of medical evidence to support such allegations, the ALJ cannot give way to this testimony. And he doesn't have to tell us what that is. I think the ALJ recounted the medical evidence in his decision, and he could have specified, given greater specification in this particular paragraph, but having recounted the medical evidence already and the relevant medical opinions he considered, I don't think he needed to. It would just be redundant, Your Honor. Okay. Correct me if I'm wrong. The daughter only testified that her mother had to stop sewing because her hands hurt. That was the extent of her testimony, wasn't it? I believe the daughter testified that she, let's see where that is again. That her hand hurt when she sewed, and the ALJ acknowledged she had hand limitation. But I believe that was the extent of her testimony, wasn't it, that she gave up sewing because of her hands. Actually, the ALJ also recounted the claimant's daughter's testimony that she had worked in the same company with her mother, so I guess they had worked together at some point, that the claimant had soreness of the hands, memory problems, and difficulty walking. And this is just reading out of the ALJ's decision here. Soreness of the hands, memory problems, those were addressed by the examining physicians. And difficulty walking, I'm not sure that there's any medical basis for that, although beyond that is what the ALJ found in the limitations that he assessed. Quick question about the voc expert. There's a vocational expert in this case, and what vocational experts do is they take the information that's come in before and then opine to the ALJ based frequently on hypothetical questions whether the claimant can perform some vocational activities that are related to the vocational economy. Does that get it about right? Yes, Your Honor. Okay. And isn't there an obligation on the part of an ALJ where there's a discrepancy between the dictionary of the DOT, you know what I'm talking about, between the DOT and his own opinion? Yes. And wasn't there a conflict between the DOT description of the jobs that she purportedly do and what the voc expert testified to? I'm not sure if there was actually a conflict, but to the extent that there was any conflict the vocational expert explained the basis for his opinion. There was actually quite a bit of discussion in the testimony, and I would refer the court to that because it's quite good actually. The claimant's attorney at the time questioned the vocational expert where this testimony, where his information came from, and the vocational expert explained that it came from, among other things, the dictionary of occupational titles, but also local information, that is, information as to jobs in this state, as well as his own, I believe he said, professional experience in judgment, which was particularly important in this case because, and I wanted to clarify something Judge Cowan had said earlier about claimant being limited to sedentary work, that's not quite the case here, which is why the vocational expert was necessary. Claimant could do more than sedentary work, but not light work. So the claimant didn't really fit into either category, which is why the vocational expert's testimony was so critical, such that the vocational expert could identify jobs that the claimant could do with those unique observational decisions. What about the unskilled work? Opposing counsel complains about the fact that he assigned her unskilled work, which didn't translate given her skills. I believe that the job, that there was only one job identified by claimant's attorney as unskilled of the many jobs that the vocational expert had identified, and that was surveillance system monitor. Now, the vocational expert in his testimony also identified various other jobs, information clerk, gate guard, customer service representative, and receptionist, and this is in the excerpts of record at pages 340 through 341, and those jobs were skilled. The vocational expert in his testimony was aware that he had to identify unskilled jobs or jobs to which skills could be transferred to, and he did so. I want to get back to this Dr. Tucker, because I'm not sure I understand exactly what the record shows. The record shows she was referred to Dr. Tucker, yes? I think that's correct, Your Honor. I mean, it's that we have here. That's a referral form. Is there any indications that, and I guess referred means, if I understand the term correctly, as I read the term, it means she was told to go see Dr. Tucker. She was given a referral. She was given an opportunity to see Dr. Tucker. That's how I read it. I don't know. Is there any indication that she actually did go see Dr. Tucker? I think she saw Dr. Tucker. It appears that Dr. Tucker, or someone as a result of that visit, prescribed Prozac. But I think the more important information to take away from this. I thought Prozac was prescribed by her general physician, general practitioner. That's how I understood the record, but maybe not. Maybe I'm wrong about that. I'm not sure exactly who prescribed it. Then the next page after that page in the excerpts of record, I believe it's one of those pages, mentions the prescription for Prozac. It might have been since Dr. Tucker. She also got Pax, though, which if I remember correctly is also some sort of mental issue. I don't know. I think it is, at least sometimes. I'm not sure beyond that. I mean, I don't know. But so what is the status of whether she did see or did not see Dr., as a record, as to whether she did or did not see Dr. Tucker? I think ALJ seemed to think that she did not. If I read the, I mean, she says she didn't actually go see a specialist. I think that if Dr. ‑‑ well, assuming that Dr. Tucker did see claimant, that was it at one time. There's no evidence that there was any treatment relationship. I mean, there may have been prescribed medications, although since Dr. Tucker appears to be a psychologist, I have to question her ability to prescribe medications. And as you said, it appeared that Prozac was prescribed by her primary physician. But at any rate, this was the one ‑‑ We don't have any treatment notes from Dr. Tucker. Pardon? We don't have any treatment notes, any entries in her medical record from Dr. Tucker. No, Your Honor. There are no ‑‑ I'm unaware of any treatment notes, and none were provided, if there were any to be provided to support his disability claim. Do you have 194 there? I'm sorry. Do you have 194 there? Yes, Your Honor. Down towards the bottom of the page, is there a category called treatment? Treatment objectives. Is there a category called treatment? Yes, Your Honor. Are there some notes? Yes, there are. Is it the government's position those aren't treatment notes? Oh, I think it is. And your answer to Judge Kaczynski was wrong, right? No, not at all, Your Honor. Because there were no treatment notes. Oh, no treatment notes from ‑‑ I'm sorry, Your Honor. From what the commissioner considers a treating source, which is someone who's seen the claimant over time. And the treatment notes indicate that she's going to be in consultation with Dr. ‑‑ I'm sorry, I can't read that. Meek? Meck? I can't read that either, Your Honor. But I see where you mean. So there are treatment notes. There's this note. Yes, Your Honor. Okay. Thank you. Thank you, Your Honor. I'd just like to follow up on a couple of points made. One of the questions asked was the number of unskilled jobs identified by the vocational expert. The vocational expert identified two jobs that were unskilled. One was the surveillance system monitor, and the other one was the information clerk. The appeals counsel even recognized that the information clerk position was an unskilled occupation. Justice Cowan asked about the late ‑‑ That's certainly my experience with information clerks. Justice Cowan asked about the late testimony of Ms. Barron's daughter. Ms. Barron's daughter testified a little bit more about her mother other than she gave up sewing. She also said she had memory loss. Yes. But she never received any treatment beyond getting Prozac from any specialist for her memory loss. I'm not quite sure if the Ph.D., Dr. Tucker, was treating her for the memory loss. Not being a doctor, I don't know what the treatment was regarding her depression. It could have involved memory loss. I just don't know. Well, I mean, there was nothing in the briefs that I read that she received any treatment for memory loss. And the Prozac she received was from her general practitioner, not from any specialist. I think on page 194 it indicates that she was prescribed the Prozac from Dr. Tucker in consultation with Dr. Meeks or Meeker, that's a part of the record that we can't decipher that doctor's name. But it's clear that she was prescribed Prozac from her consultations with Dr. Tucker, the Ph.D. Whether the Ph.D. prescribed the medicine, I'm not sure, but probably in consultation with an M.D., that's done. And that's indicated in the record on 194. Ms. Barron's daughter also testified that her mother used to belong to a sewing club, but she had to quit because she has no energy to do anything anymore. She testified that her mother's legs hurt when she walks, that her mother cannot sit through an entire movie because she can't focus and concentrate on the movie. She also testified that she constantly has to remind her mother to do things because her mother forgets. Ms. Catherine Barron also completed two daily activities questionnaires that are found in the record at 104-109 and 151-156. And she stated in there that her mother has trouble sleeping at night and that she naps periodically during the day. She has trouble, her mother has trouble doing her hair, so her daughter has to help her do her hair. She testified that her mother doesn't get dressed up anymore or wear any makeup anymore. She testified that her father and herself has to help the mother prepare meals. Her father assists her mother with grocery shopping and heavy lifting of any items. How old is the petitioner? How old is she again? Ms. Barron is 59 now. At the time of the ALJ's decision, she was 56 and 8 months. At the time of the Appeals Council decision, she was 56 years old, or advanced age, what the Social Security Administration considers to be advanced age at that point. I thought it was 54. I'm sorry? I thought it was 54. I think closely approaching advanced age is 50 to 54, and then over 54 is considered advanced age. The SSA decision says she's 54.  They left her there for months. He did. Another point. I'm sorry? You're out of time. Okay. Thank you very much, Your Honor. Cases are used and submitted.
judges: Kozinski, Hawkins, Cowen